IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

BRIGITTE THOMAS, in her
individual capacity and as
Administrator of the Estate of
Bryan Penner,

                    Plaintiff,

          v.

DESCHUTES COUNTY, et al.

                    Defendants.

_____

Civ. No. 6:19-cv-01781-AA

**OPINION & ORDER**

AIKEN, District Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment, ECF No. 45.  The Court concludes that this matter is appropriate for resolution without oral argument.  For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## LEGAL STANDARDS

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Substantive law on an issue determines the materiality of a fact.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809

F.2d 626, 630 (9th Cir. 1987).  Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiff Brigitte Thomas is the mother of Bryan Penner, now deceased, and she is the personal representative of his Estate.  Second Am. Compl. ("SAC") at 1. ECF No. 10.  Penner died while in the custody of the Deschutes County jail.  *Id.* at ¶ 2.

Defendant Deschutes County Sheriff's Office ("DCSO") is a department of Defendant Deschutes County (the "County").  Ans. ¶ 5.  ECF No. 11.  DCSO operates the Deschutes County Jail.  Defendants Joshua Whitcomb and Blair Barkhurst are corrections sergeants with DCSO.  Shults Decl. ¶ 5, ECF No. 46; Ans. ¶¶ 6-7.

## I.    Deschutes County Jail

DCSO operates the jail in accordance with the Oregon Jail Standards, a set of voluntary best practices designed to optimize operations within Oregon jails and create state-wide consistency in the operation of county jails.  Shults Decl. ¶ 25.  The Oregon Jail Standards were created by the Oregon State Sheriff's Association and have been adopted by all Sheriff's Offices in the state.  *Id.*  Consistent with the Oregon Jail Standards and with jail policy, inmates at the jail, including Penner, were subject to personal visual inspection at least once per hour.  *Id.*

DCSO had a suicide prevention policy in place at the time of Penner's death. Shults Decl. ¶ 27; Ex. L.  This policy met the requirements of the Oregon Jail Standards.  Shults Decl. ¶ 27.  Under the policy, all DCSO corrections deputies received regular training on inmate suicide prevention and inmate mental health. *Id.* at ¶ 28.  This training included recognizing the signs and symptoms of suicide risk; responding to concerns of an inmate's risk of suicide; preventative measures when an inmate is determined to be a suicide risk; and training on the DCSO suicide prevention policy generally.  *Id.*  The training provided to correctional deputies "satisfied, and in many cases exceeded, all requirements of the Oregon Department of Public Safety Standards and Training [("DPSST")], and the Oregon Jail Standards."  *Id.*  All deputies responsible for the care and supervision of Penner during his time in the jail had received suicide prevention training prior to Penner being booked into the jail on February 22, 2018.  *Id.* at ¶ 29; Ex. M (attendance roster showing that Barkhurst and Whitcomb attended suicide prevention training on

January 23, 2017); Ex. N (attendance roster showing that Barkhurst and Whitcomb attended suicide prevention training on February 20, 2018).

In February and March 2018, the jail had trained mental health professionals on staff, whose duties "included assessing the mental health of inmates and determining whether they posed a suicide risk." Shults Decl. ¶ 32. At the time, the jail's suicide prevention policy provided that if a member of jail staff had concerns about an inmate's suicide risk, the staff member was to communicate their concerns to the mental health professional so that the inmate could be assessed. *Id.*

The jail also had a policy in place to prevent abuse or harassment of inmates. Shults Decl. ¶ 33; Ex. O. Recognition of and response to inmate-on-inmate violence was a regular topic of training for jail staff. Shults Decl. ¶ 33. This training met or exceeded all requirements of the DPSST and Oregon Jail Standards. *Id.* All DCSO deputies responsible for Penner during his time at the jail had received this training prior to Penner being booked into the jail on February 22, 2018. *Id.* The potential for harassment, violence, and threats was also considered when jail staff made decisions about inmate housing and specific efforts were made not to house inmates together if DCSO knew that an inmate posed a risk of harm to another inmate or if a material conflict existed between inmates. *Id.* at ¶ 34.

In addition to training sessions, jail staff were required to regularly review jail policies. Shults Decl. ¶ 35.

Between February and March of 2018, the jail housed between 250 and 300 inmates at any given time. Shults Decl. ¶ 21. Inmates received an Inmate Manual

during booking which instructed them on how to file grievances for conditions of confinement, actions of other inmates, living conditions, and health care. *Id.* at ¶ 37; Ex. R. Penner did not file a grievance to any member of jail staff concerning the conditions of his confinement, the actions of other inmates, or his own mental health needs. Shults Decl. ¶ 38.

The jail uses a system called Telemate, which allows inmates to communicate with people outside of the jail via text messages or telephone calls. Shults Decl. ¶ 21. Text messages and calls made via Telemate are recorded and DCSO maintains the records, but because of the sheer volume of recordings and the limited staffing of the jail, these recordings are not reviewed as a matter of course. *Id.* at ¶ 22. "The recordings were generally reviewed if and when DCSO has reason to believe they could contain information pertinent to an event or matter of concern at the Jail or could contain information pertinent to a criminal investigation." *Id.* In the case of Penner, DCSO staff did not review Penner's communications until after his death and no DCSO staffer was aware of the contents of Penner's Telemate communications until after his death. *Id.*

The jail also uses a close-circuit video recording system in parts of the jail and DCSO maintains the recordings for a period of time. Shults Decl. ¶ 23. Because of the number of cameras and the limited staffing of the jail, "it was not feasible for individual video recordings to be reviewed by Jail staff on a regular basis." *Id.* The recordings would be reviewed if DCSO had reason to believe that a recording had

captured information pertinent to an incident or event at the jail. *Id.* DCSO did not review any of the video recordings of Penner at the jail prior to Penner's death. *Id.*

## II.    Bryan Penner

Penner was booked into the Deschutes County jail on February 22, 2018 on two counts of contempt of court in Deschutes County case 18CN00837. Shults Decl. ¶ 2; Ex. A. Penner also had a pending probation violation charge from a 2016 Crook County criminal case, 16CR53887. Shults Decl. ¶ 2; Ex. B. The record indicates that Penner was also facing charges of kidnapping, theft, and criminal mischief. Shults Decl. Ex. C, at 3. Penner received a copy of the Inmate Manual on February 22, 2018. Shults Decl. ¶ 37.

When Penner was booked into the jail, a DCSO deputy completed a Pre-Booking Questionnaire by asking the officer who transported Penner to the jail questions about Penner and recording the officer's responses on the form. Shults Decl. ¶ 6. Penner's Pre-Booking Questionnaire indicated that Penner had not said or done anything that indicated thoughts of suicide or self-harm and that there were no physical signs of self-harm. Shults Decl. Ex. D.

During booking, Penner also completed and signed an Inmate Medical Screening Form. Shults Decl. ¶ 6. On his Intake Medical Screening Form, Penner denied ever having attempted suicide. Shults Decl. Ex. E, at 1.

On February 28, 2018, jail staff completed a Primary Classification Form for Penner by asking Penner questions and recording his responses on the form. Shults Decl. ¶ 7. "The purpose of this form was to assist DCSO i[n] determining an

appropriate and safe housing assignment for Penner within the Jail." *Id.* During the interview, Penner denied having suicidal thoughts and denied needing mental health assistance. *Id.*; Ex. F. Penner denied having any known enemies and did not request protective custody. *Id.* To the best of DCSO's knowledge, Penner had not been diagnosed with a mental illness. Shults Decl. ¶ 8.

Penner had previously been booked into the jail on December 11, 2017 on other charges and was held in custody through January 6, 2018. Shults Decl. ¶ 17. As part of that previous period of incarceration, Penner filled out an Intake Medical Screening Form and provided information for a Primary Classification Form. *Id.* at ¶¶ 18-19. In his December 11, 2017 Intake Medical Screening Form, Penner denied having attempted suicide and disclosed that he had been hospitalized two weeks earlier "for a fall he took at home." Shults Decl. Ex. J. In his December 2017 Primary Classification Form, Penner denied having known enemies, denied feeling suicidal, reported that he did not need to see a mental health counselor, and did not request protective custody. Shults Decl. Ex. K. At no point during that earlier period of incarceration did Penner "through his statements, behaviors, or actions, give DCSO or any Jail staff any reason to believe he felt unsafe, threatened, harassed, suicidal or in need of mental health assistance." Shults Decl. ¶ 20.

Defendant Kaitlyn Kitaji is a licensed clinical social worker with a master's degree in social work and experience as a crisis mental health clinician. Kitaji Decl. ¶¶ 1-2. ECF No. 47. From September 2016 through April 2018, Kitaji was employed as a behavioral health specialist at the Deschutes County jail. *Id.* at ¶ 3. In that

capacity, Kitaji's primary duties were to "(a) assess the mental health status of inmates, including whether an inmate was suicidal or otherwise presented a risk of harm to himself or others, (b) advise DCSO corrections staff as to any services or precautions an inmate required due to his or her mental health status including, without limitation, any necessary suicide precautions, and (c) provide inmates with mental health crisis intervention when necessary." *Id.*

On February 25, 2018, Penner's mother reported to jail staff that Penner had attempted suicide in late November 2017. Kitaji Decl. ¶ 4; Shults Decl. ¶ 9. This information had not been disclosed by Penner during his intake screening. Kitaji Decl. Ex. A. "This was the first time DCSO obtained information from any source that Penner had previously attempted suicide." Shults Decl. ¶ 9. Kitaji met with Penner to assess his mental health to determine if suicide precautions were warranted. Kitaji Decl. ¶ 4. During the meeting, Penner acknowledged past suicide attempts and admitted to struggling with suicidal thoughts, but denied any current suicidal ideation, thoughts, or intentions. *Id.* at ¶ 6; Ex. A. Penner told Kitaji that he did not like being housed in the 500 block because it "reminds him of something negative," and shared that he had done well on the 1200 block in the past. Kitaji Decl. Ex. A. Penner also told Kitaji that the "most beneficial thing for him is to be housed around people in a dorm." *Id.* Penner agreed to a verbal safety plan and further agreed to request help if he felt suicidal or otherwise had a mental health crisis in the future. Kitaji Decl. ¶ 6. After meeting with Penner, Kitaji's opinion was that Penner "did not present a clinically significant risk of suicide at that time and

that no specific suicide prevention measures were required." *Id.* at ¶ 5. Kitaji communicated her conclusions to jail staff, along with a recommendation that Penner be moved to a dormitory living arrangement per his request. *Id.*

Shortly after Penner's meeting with Kitaji, DCSO transferred Penner to a dormitory unit of Penner's choosing "to allow Penner to reside and interact with inmates he knew and with whom he felt comfortable." Shults Decl. ¶ 12.

On several occasions during his time at the jail, Penner "expressed to jail staff that he believed he would be released from the Jail shortly and transported to Prineville on the probation violation charge." Shults Decl. ¶ 13. Jail staff also believed that Penner would soon be released and transported to Prineville and the staff understood that "Penner was looking forward to the transfer." *Id.* at ¶ 16.

On March 6, 2018, Penner sent a text message to his mother telling her that he would "be fine til I get to Prineville." Shults Decl. ¶ 14. Penner told his mother that he was in a "good dorm" and had "friends in here who got my back." *Id.* These text messages were not reviewed by DCSO until after Penner's death. *Id.* at ¶ 22.

On March 8, 2018, Penner's criminal defense attorney filed a motion requesting Penner's conditional release or, alternatively, a reduction in his bond. Shults Decl. ¶ 15; Ex. I. This motion remained pending at the time of Penner's death. Shults Decl. ¶ 15.

On March 11, 2018, Penner was found hanging by a towel in the shower of his dormitory housing unit. Shults Decl. ¶ 3. Whitcomb was not on duty on March 11, 2018. *Id.* at ¶ 5. Penner was transported to the hospital but passed away the

following morning. *Id.* at ¶ 3. Following his death, the State Medical Examiner performed an autopsy and determined Penner had died of asphyxiation by hanging and that his death was a suicide. Shults Decl. Ex. C.

After Penner's death, the Bend Police Department ("BPD") requested and received video recordings of Penner's cell from February 22, 2018 through the date of his death. Shults Decl. ¶ 24. During its review of the recordings, BPD found that the cameras had captured Penner apparently attempting to hang himself in his cell on February 23, 2018. *Id.* DCSO was not aware of this incident until it received BPD's report following Penner's death. *Id.*

## DISCUSSION

Plaintiff, as administrator for the Estate, brings claims for (1) wrongful death based on preventable suicide; (2) wrongful death based on preventable homicide; (3) a claim for failure to protect in violation of Penner's Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983; and (4) a § 1983 *Monell* claim against the County and DCSO based on failure to train. On her own behalf, Plaintiff brings claims for (5) violation of her substantive due process rights under the Fourteenth Amendment pursuant to §1983.

Defendants filed their motion for summary judgment on December 13, 2021. ECF No. 45. Plaintiff requested and received multiple extensions of time to respond to Defendants' motion. ECF Nos. 55, 57, 59, 61, 64. On April 6, 2022, the Court granted a final extension setting the response deadline for April 11, 2022 and warning Plaintiff that no further motions for extension of time would be considered and that

the motion would be taken under advisement on May 2, 2022.  ECF No. 61.  Despite these extensions, Plaintiff did not file a timely response brief.  Plaintiff belatedly filed a response in opposition to Defendants' motion on May 2, 2022, nearly a month after the final deadline.  ECF No. 65.  Defendants object to the late filing and urge the Court to disregard the response brief on the basis that its tardiness prejudiced Defendants' opportunity to file a reply brief.  ECF No. 66.  In light of Plaintiff's pro se status, the Court has reviewed the untimely response brief and its supporting exhibits.

## I.    Unnamed Defendants

Plaintiff has brought this action against Unknown Deputies working at the jail.  The operative Second Amended Complaint was filed on February 25, 2020.  In the intervening months, Plaintiff has not identified these John Doe defendants, nor has she served them.  Pursuant to Rule 4(m), a court must dismiss an action without prejudice if a defendant has not been served within 90 days after the complaint has been filed, unless the plaintiff shows good cause for the failure.  Fed. R. Civ. P. 4(m).  In this case, Plaintiff has not identified or served the Doe defendants, nor has she shown good cause for the failure.  The claims against the Unnamed Defendants must therefore be dismissed.

## II.    State Law Wrongful Death Claims

Plaintiff brings claims for wrongful death against Defendants based on Penner's suicide or, alternatively, on his homicide at the hands of another inmate. With respect to the claim for wrongful death by homicide, the uncontradicted

evidence in this case is that Penner's death was the result of suicide and there is no evidence that Penner was killed by another person.  Shults Decl. Ex. C.  In his intake forms, Penner denied having any known enemies and declined protective custody. While in custody, Penner never reported feeling unsafe and the jail staff had no reason to believe Penner's life was in danger from other inmates.  The Court therefore grants Defendants' motion for summary judgment as to wrongful death by homicide and the Court moves on to consideration of Plaintiff's claim for wrongful death by suicide.

To prevail on a negligence claim under Oregon law, the plaintiff must show "the defendant's conduct created a foreseeable and unreasonable risk of legally cognizable harm to the plaintiff and that the conduct in fact caused that kind of harm to the plaintiff." *Chapman v. Mayfield*, 358 Or. 196, 205 (2015) (en banc).  In Oregon, the traditional duty-breach analysis "is subsumed in the concept of general foreseeability, 'unless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty.'" *Id.* (quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 17 (1987)).  The relationship between jailer and inmate is such a relationship.  *Nordenstrom v. Corizon Health, Inc.*, No. 3:18-cv-01754-HZ, 2021 WL 2546275, at *20 (D. Or. June 18, 2021). "Deputies must care for the prisoners in their custody and generally protect them from harm," and in practical terms, this translates into a county's "duty to comply with its own policies, relevant licensing standards, and the general standard of care for its industry." *Hanington v. Multnomah Cnty.*, ___ F. Supp.3d ___, Case No. 3:19-

cv-01533-MO, 2022 WL 861266, at *14 (D. Or. Mar. 23, 2022) (internal quotation marks and citation omitted).

In this case, the Court notes that Penner went to some lengths to conceal his intentions from jail staff by repeatedly denying a history of suicide attempts when he was booked into the jail in December 2017 and in February 2018. Penner also misled jail staff about the nature of his hospitalization in November 2017 by telling them that it was related to a fall, rather than an attempted suicide. Penner expressed to jail staff that he was looking forward to release from the jail and transfer to Crook County, which the jail staff interpreted as inconsistent with a risk of suicide. Plaintiff was recorded in a possible suicide attempt shortly after being booked into the jail and before his assessment by Kitaji, but the uncontradicted evidence is that there is no practical way for all jail footage to be reviewed and so the jail only investigates its video recording in the event of an incident. The uncontradicted evidence is that the jail only learned of the earlier in-custody suicide attempt when BPD reviewed the footage after Penner's death.

However, the Court notes Kitaji's assessment began at 11:19 a.m. on February 25, 2018 and her report was submitted only fourteen minutes later, at 11:33 a.m. Kitaji Decl. Ex. A. Kitaji noted that Penner presented with a flat affect and an inattentive disposition and that he "would often stare and was quiet." *Id.* Penner told Kitaji that he had not followed through on with mental health services after his previous suicide attempt, despite admitting that he "does struggle with suicidal thoughts." *Id.* Kitaji accepted Penner's representations concerning his willingness

to reach out to jail staff in the event of a crisis, despite his demonstrated willingness and ability to deceive jail staff concerning his mental health and his history of attempted suicide.  On this record, the Court concludes that material questions of fact preclude summary judgment as to Plaintiff's claim for wrongful death against Kitaji.

As to the other Defendants, they relied on Kitaji's assessment and followed her recommendations and the Court concludes that no reasonable jury could conclude that the other Defendants' conduct fell below the standard of care owed to Penner. The Court therefore grants summary judgment on this claim as to the remaining Defendants.

## III.    Failure to Protect

Plaintiff alleges, pursuant to § 1983, that Defendants failed to protect Penner, either from self-harm or harm at the hands of other inmates, in violation of his Fourteenth Amendment rights.  Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  To maintain a claim under § 1983, "a plaintiff must both (1) allege the deprivation of a right secured by the federal Constitution or statutory law, and (2) allege that the deprivation was committed by a person acting under color of state law." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

To make out a claim for failure to protect under the Fourteenth Amendment, a plaintiff must show that:

(1) defendant made an intentional decision with respect to the condition of plaintiff's confinement; (2) plaintiff was exposed to a substantial risk of serious harm that could have been eliminated through reasonable and available measures; (3) defendant did not take reasonable available measure to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking those measures, defendant caused plaintiff's injuries.

*Williams v. Grant Cnty.*, Case No. 2:15-CV-01760-SU, 2016 WL 4745179, at *5 (D. Or. Sept. 12, 2016) (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016)) (internal quotation marks omitted, alterations normalized).

In making out his claim, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Castro*, 833 F.3d at 1071. In addition, with respect to the third element, the failure to take reasonable available measures to abate the risk, "the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Id.* (internal quotation marks and citation omitted, alterations normalized).

In this case, as discussed above, Penner actively concealed his history of suicide attempts from the jail staff. When the jail learned of Penner's prior suicide attempt, they promptly dispatched Kitaji to assess Penner as a suicide risk. After that assessment, Kitaji determined that Penner was not presently at risk of suicide and that no preventative measure should be implemented. DCSO staff acted consistent with that recommendation. On this record, no reasonable jury could conclude that Defendants acted with reckless disregard to the risk that Penner might commit

suicide, nor could a reasonable jury conclude that Defendants' conduct was objectively unreasonable based on the information Defendants possessed at the time. To the extent that Plaintiff's claim rests on a failure to protect Penner from other inmates, Plaintiff's case is even more tenuous. Penner denied having any known enemies, declined protective custody, and never informed jail staff that he was at risk from any other inmate. And, as noted, the uncontested evidence shows that Penner died by suicide and not at the hands of another inmate. The Court therefore grants Defendants' motion with respect to Plaintiff's claim for failure to protect under the Fourteenth Amendment.

## IV.    *Monell* Liability

Plaintiff alleges that Penner's death was the result of the County and DCSO's failure to train its employees to recognize and respond to the risk of suicide by inmates or inmate-on-inmate violence.

Under *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal entity may be held liable under § 1983 if the plaintiff can show that a municipal custom or policy caused the violation of their constitutional rights. The Supreme Court has made clear that the municipality itself must cause the constitutional deprivation and that a local government may not be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). *Monell* liability can arise from a failure to train, supervise, or discipline that amounts to an official policy of deliberate indifference to an individual's constitutional rights. *Horton ex rel. Horton v. City of*

*Santa Maria*, 915 F.3d 592, 602-03 (9th Cir. 2019).  For the failure to train to represent a policy for which the municipality can be held responsible, the need for more or different training must be "so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Harris*, 489 U.S. at 390.  To demonstrate a municipality's deliberate indifference to its inadequate training program, the plaintiff usually must show a pattern of similar constitutional violations caused by inadequate training.  *Connick v. Thompson*, 563 U.S. 51, 62 (2011).  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.* at 61.

In this case, the uncontested evidence shows that DCSO had robust policies in place concerning both suicide prevention and inmate violence and that those policies met or exceeded the requirements of the DPSST and the Oregon Jail Standards. Correctional deputies were required to participate in regular training on those policies and the record shows that the individual deputy Defendants in this case had undergone that regular training shortly before Penner was booked into DCSO custody.  No reasonable jury could conclude that there was a defect of training regarding either suicide prevention or inmate violence that was so obvious that the failure to address it amounted to deliberate indifference.  The Court therefore concludes that Defendants are entitled to summary judgment on this claim.

### V.    Substantive Due Process

Plaintiff brings a substantive due process claim based on the death of Penner. "Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dept. of Corr. and Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). The Supreme Court has held that "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (internal quotation marks and citation omitted). In the prison context, conduct that is deliberately indifferent may rise to the level of "conscience-shocking." *Lemire*, 726 F.3d at 1075. "A prison official's deliberately indifferent conduct will generally 'shock the conscience' so long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.*

As discussed in the previous sections, Penner actively concealed his history of attempted suicide from DCSO staff and declined mental health treatment. Once jail staff learned of Penner's past suicide attempt, he was promptly assessed by the jail's mental health professional. During that assessment, Penner denied present suicidal ideation or plans of self-harm and agreed to a safety plan. No reasonable jury could conclude that the conduct of Defendants in this case rises to the level of deliberate indifference. The Court therefore grants Defendants' motion for summary judgment as to this claim.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF No. 45, is GRANTED in part and DENIED in part. Defendant's motion is denied as to Plaintiff's claim for wrongful death by reason of preventable suicide against Defendant Kitaji but granted as to all other Defendants. Defendants' motion for summary judgment is granted as to all other claims. The Court will retain jurisdiction over the remaining state law claim for wrongful death.

It is so ORDERED and DATED this _____12th_____ day of July 2022.

 /s/Ann Aiken
ANN AIKEN
United States District Judge